**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARC ABBINK,<br><br>     Plaintiff,<br><br>   v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social<br>Security,<br><br>     Defendant. | ) Case No. SACV 16-0324-JPR<br>)<br>)<br>) **MEMORANDUM DECISION AND ORDER**<br>) **AFFIRMING COMMISSIONER**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed November 3, 2016, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

## II. BACKGROUND

Plaintiff was born in 1962. (Administrative Record ("AR") 168.) He completed two years of college (AR 219) and worked as an architectural draftsman, general laborer, and tutor (AR 220).

On January 17, 2013, Plaintiff filed an application for DIB and on January 22 he filed one for SSI, alleging in each that he had been unable to work since December 30, 2012 (AR 168, 170), because of a head injury, physical limitations, anxiety, arthritis, and diabetes (AR 218). After his applications were denied initially and on reconsideration (AR 73-74, 105-06), he requested a hearing before an Administrative Law Judge (AR 127). A hearing was held on September 21, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (AR 33-48.) In a written decision issued October 27, 2015, the ALJ found Plaintiff not disabled. (AR 16-32.) Plaintiff requested review from the Appeals Council, and on January 28, 2016, it denied review. (AR 1-6.) This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1996).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,
828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first
step, the Commissioner must determine whether the claimant is
currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.
§§ 404.1520(a)(4)(I), 416.920(a)(4)(I).

If the claimant is not engaged in substantial gainful

3

activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, he is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.

That determination comprises the fifth and final step in the

sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v);

<u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B. <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since December 30, 2012, the alleged

onset date. (AR 21.) At step two, he concluded that Plaintiff

had severe impairments of "status post remote motorcycle accident

in 1980; status post remote cardiac arrest; status post fracture

and reconstructive surgery of right tibia; and anxiety

disorders." (<u>Id.</u>) At step three, he determined that Plaintiff's

impairments did not meet or equal a listing. (AR 23.)

At step four, the ALJ found that Plaintiff had the RFC to

perform medium work, was able to lift and carry 25 pounds

frequently and 50 pounds occasionally, could sit and stand about

six hours in an eight-hour workday, and could perform "no greater

than simple routine tasks" with "no more than occasional contact

with the public and coworkers." (AR 24.)

Based on the VE's testimony, the ALJ concluded that

Plaintiff could not perform his past relevant work. (AR 26.) At

step five, he relied on the VE's testimony to find that given

Plaintiff's RFC for medium work "impeded by additional

limitations," he could perform two "representative" medium,

unskilled occupations in the national economy: (1) "dishwasher,"[2]

---

[2] Although the VE and the ALJ both used the job title "dishwasher," the DOT number provided by the VE and repeated by the ALJ corresponds to the job of "kitchen helper," which is a medium, unskilled position.

5

DOT 318.687-010, 1991 WL 672755, and (2) "hand packager," DOT 920.587-018, 1991 WL 687916.  (AR 26-27.)  Accordingly, he found Plaintiff not disabled.  (AR 27.)

**V.    DISCUSSION**

Plaintiff argues that the ALJ erred in (1) considering and evaluating the opinion of Dr. Jason B. Miller and (2) assessing Plaintiff's credibility.  (See J. Stip. at 3.)

A.    The ALJ Properly Assessed the Medical Evidence

Plaintiff contends that the ALJ failed to properly consider and evaluate Dr. Miller's medical opinion, including that Plaintiff would be "off task 30% or more of the time."  (Id. at 3-7.)  For the reasons discussed below, remand is not warranted on this ground.

1.    Applicable law

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither.  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  Id.

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.

§§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. (citing Lester, 81 F.3d at 830-31). Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

> 2. Relevant background

Plaintiff severely injured his head, brain stem, and tibia in a motorcycle accident in 1980. (AR 261.) From 2006 to 2010, he was evaluated and treated by Dr. James S. Sands. (See AR 368-99, 449-54.) In 2007, Dr. Sands diagnosed anxiety and depression. (AR 449, 451.) On July 22, 2010, Plaintiff complained of an earlier anxiety attack but was noted to be "doing well on meds." (AR 368.) On January 1, 2013, Plaintiff was referred to Dr. Aimee David for treatment and counseling.

(AR 410.)  In 2013, Dr. David noted that Plaintiff complained of stress and anxiety, wanted to finish an architect degree, was completing training classes, and was taking Paxil.[3]  (AR 402-04.) On February 18, 2013, Plaintiff reported to a doctor that he "desire[d] to be placed on disability" and noted that he had stopped taking his medications.  (AR 408.)  On April 8, 2013, he reported to Dr. David that although he felt "overwhelmed," his anxiety was "not bad" and he was a "pretty happy guy."  (AR 570.)

On May 23, 2013, state consulting psychologist Sonia G. Martin completed a psychological examination and evaluation.  (AR 426-30.)  Dr. Martin noted Plaintiff's history of head and brain-stem injury in 1980 and that he was taking Paxil, metformin, and simvastatin.[4]  (AR 427.)  Plaintiff showed "good" concentration and attention span, "average" intellectual functioning, and "intact" insight and judgment.  (AR 428.)  Dr. Martin diagnosed Plaintiff with anxiety disorder and assigned him a global assessment of functioning ("GAF") score of 70.[5]  (AR 429.)

---

[3] Paxil is a selective serotonin reuptake inhibitor used to treat depression and other conditions.  Paroxetine, MedlinePlus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html (last updated Nov. 15, 2014).

[4] Metformin is used to treat diabetes.  Metformin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a696005.html (last updated Apr. 15, 2016).  Simvastatin is used to reduce cholesterol.  Simvastatin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a692030.html (last updated Sept. 15, 2014).

[5] GAF scores assess a person's overall psychological functioning on a scale of 1 to 100.  See Diagnostic and Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000). A GAF score of 61 to 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal

Plaintiff was "unimpaired" in his ability to follow simple — and complex or detailed — instructions; maintain adequate pace or persistence to perform one- or two-step simple repetitive tasks or complex tasks; maintain adequate attention or concentration; adapt to changes in job routine; and interact appropriately with coworkers, supervisors, and the public on a regular basis. (AR 430). He had mild impairment in his ability to withstand the stress of a routine workday and adapt to the changes, hazards, and stressors in a workplace setting. (Id.) His prognosis was "good with comprehensive mental health services to address his anxiety." (Id.)

On June 18, 2013, state-agency medical consultant Dr. Dan Funkenstein[6] completed the psychiatric portion of the disability determination for Plaintiff's SSI and DIB claims. (AR 49-60, 61-72.) Dr. Funkenstein found that Plaintiff had "mild to no limitations" in his mental functioning (AR 54, 66); no restrictions in his activities of daily living; no difficulty maintaining social functioning; and "mild" difficulty maintaining concentration, persistence, or pace (AR 55, 67). On December 22, 2013, state-agency medical consultant Dr. Richard Kaspar[7]

relationships." DSM-IV 34. GAF scores have been excluded from the latest edition of DSM because of concerns about their reliability and lack of clarity, however. See DSM-V 15-16 (5th ed. 2013).

[6] Dr. Funkenstein's signature line includes a medical-consultant code of "20," indicating "[n]eurology" (AR 54); see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004.

[7] Dr. Kaspar's signature line includes a medical-consultant code of "38," indicating "[p]sychology" (AR 82); see POMS DI

9

completed the psychiatric portion of the disability determination for Plaintiff's SSI and DIB claims on reconsideration. (AR 75-89, 90-104.) Dr. Kaspar confirmed Dr. Funkenstein's assessment. (AR 81-82, 96-97.)

Plaintiff reported symptoms of anxiety to various healthcare professionals in 2014; his symptoms waxed and waned. (See, e.g., AR 512 (Sept. 4, 2014: "I'm so anxious. It's debilitating"), 510 (Sept. 11, 2014: feeling "much better . . . less anxious and on edge"; reported exercising and interacting socially with others), 495 (Oct. 10, 2014: reporting symptoms of anxiety).) On November 6, 2014, Plaintiff stated that he "just want[ed] to kick back and be happy" and was "[h]oping to get SSI" because he "does not feel able to look for or maintain a new job," but he was "heading out after [the] appointment to help a friend paint her kitchen" and had slept "12 straight hours after doing physical labor with [a] friend." (AR 493.) On December 4, 2014, Plaintiff reported that his ex-wife had recently died and that he "can't control [his] emotions." (AR 491.) Dr. David noted that his "grief appear[ed] normal given [the] situation"[8] and that he otherwise reported "good sleep and more stabilization of his mood overall with the

---

24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004.

[8] Indeed, Plaintiff's anxiety apparently increased in response to normal stressors, such as visits with his parents. (See, e.g., AR 513 (Sept. 4, 2014: Dr. David noting "[v]isit with father triggered past memories and poor emotional presence and support from father"), 704 (June 18, 2015: Dr. David noting Plaintiff's "increased irritability" when his mother was visiting).) At other times his symptoms were well controlled.

use of citalopram."[9]  (Id.)

   On November 3, 2014, Plaintiff was evaluated by therapist
Tanya White at a behavioral health center.  (See AR 2383-405.)
Plaintiff was apparently advised to go to the center by his
attorney, following the initial denials of his SSI and DIB
claims.  (AR 2384.)  White described Plaintiff's self-reported
symptoms as "moderate[ly]" severe mood, anxiety, attention, and
conduct problems.  (AR 2384-85.)  Plaintiff was taking
atorvastatin,[10] citalopram, and metformin; he found all three
drugs "helpful."  (AR 2401.)  In a mental-status exam, Plaintiff
was alert, oriented, and cooperative and had intact concentration
and appropriate attention and judgment.  (AR 2394.)  White
diagnosed "Depressive Disorder" and a "moderate" occupational
impairment, noting that Plaintiff had "impulsively said
inappropriate statements to his employers that has led to his
being fired from multiple jobs."  (AR 2395-96.)  She found no
significant impairment or "probability of deterioration" in "an
important area of life functioning."  (AR 2397.)  White noted
that Plaintiff had been working part time for the past three
years as an extra in movies.  (AR 2403.)  He had been fired from
eight jobs since 2002 but "was not fired for his behavior at
work" but because "the economy was changing."  (Id.)  White found
that Plaintiff "does not meet criteria for [behavioral health]

---

[9] Citalopram is used to treat depression and social phobia.
Citalopram, MedlinePlus, https://medlineplus.gov/druginfo/meds/
a699001.html (last updated Nov. 15, 2014).

[10] Atorvastatin is used to reduce the risk of heart attack
and stroke.  Atorvastatin, MedlinePlus, https://medlineplus.gov/
druginfo/meds/a600045.html (last updated Aug. 15, 2015).

services" and discharged him because of "No Medical Necessity." (AR 2390.)

On December 18, 2014, Plaintiff remarked to Dr. David that he was "feeling good" and "happier now than [he] ever was before." (AR 489.) On January 7, 2015, Dr. Miller, a clinical psychologist who apparently first saw Plaintiff on December 19, 2014, interviewed him and administered a series of neuropsychological tests. (AR 656, 667.) On January 26, Dr. Miller completed a "Neuropsychological Assessment" form (AR 656-65) and a "Medical Source Statement of Ability to do Work Related Activities" (AR 667-69), both apparently based on the January 7 visit.

Plaintiff was friendly, cooperative, and attentive during the testing. (AR 657.) Other than a moderate speech-articulation defect and mild disinhibition, Plaintiff showed no negative cognitive, language, psychotic, emotional, or physical symptoms. (AR 657-58.) Dr. Miller noted that Plaintiff was "sometimes impulsive, angry, and resentful," and "his ability to concentrate and attend" were likely to be "significantly compromised" because he was "plagued by worry." (AR 659.) His "memory, language, calculation, construction, sensorimotor skills, learning, attention, adaptive behavior and social cognition remained within normal limits, with only relative weaknesses in verbal memory and visual-motor speed." (AR 664.) He may "sometimes evidence confusion, distractibility, and difficulty concentrating." (Id.) He "can rapidly shift from being friendly . . . to hostility, poorly controlled anger, and harsh self-criticism." (Id.) Dr. Miller opined that as a result

of his brain injury, "changes in routine, unexpected events, and contradictory information" were likely to cause Plaintiff "untoward stress and subsequent decompensation." (Id.) Dr. Miller opined that mental-health services would be "fairly challenging" and "difficult" for Plaintiff, and thus he did not recommend any. (AR 665.) Instead, he recommended that Plaintiff "pursue disability benefits as an alternative to employment." (Id.)

In the check-box "Medical Source Statement," Dr. Miller noted that Plaintiff had no limitations in most areas of mental ability, including his ability to understand, remember, and carry out short and simple, as well as detailed, instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (AR 667-68.) He also had no restrictions of daily living or difficulty maintaining concentration, persistence, and pace. (AR 668.) Plaintiff's performance would be precluded for 10 percent of a normal eight-hour workday by his limitations in responding appropriately to changes in a work setting. (Id.) His performance would be precluded for more than 15 percent of an eight-hour workday by

his limitations in working in coordination with, or in proximity to, others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 667-68.) His difficulty maintaining social functioning would also result in a 15 percent preclusion of performance. (AR 668.) Dr. Miller anticipated that Plaintiff would "never" be absent from work because of his impairments, but they would cause him to be "off task" more than 30 percent of the time. (AR 669.) Dr. Miller wrote,

> [Plaintiff] has a history of aggressive behavior stemming from a traumatic brain injury. This has led to numerous job terminations, the dissolution of his marriage, & physical confrontation with roommates. This occurs under perceived slights & under duress. The potential for legal consequences for his behavior is high.

(Id.)

In 2015, Plaintiff reported symptoms of anxiety that were generally under control. (See, e.g., AR 799 (Jan. 2015: "[r]eports explosive episodes about 1x/month" but "[m]ood appears stable," "[a]nxiety appears under control"), 748 (Feb. 2015: "[m]ood and anxiety appear stable and controlled," he "[c]ontinues to do part-time work for film industry," "began tutoring auto CAD (computer animated design)," and "[f]eels much

14

more relaxed and peaceful"), 746 (Mar. 2015: "goes from joking and laughter to tearfulness," but anxiety caused by "continued resentment" of father and "does not interfere with daily functioning or sleep," and he "[c]ontinues to get out daily for walks, coffee, and meals"), 741 (Apr. 2015: reported anxiety but "coping relatively well" and "[e]ngaging with others well in brief encounters"), 736 (May 2015: reported emotional instability caused by "recent stressor" of apparently finding out former girlfriend was diagnosed with cancer, but "anxiety well under control").) Plaintiff had open heart surgery in May 2015. (See AR 719, 1684.) In June 2015, Dr. David noted that Plaintiff had "increased irritability after . . . surgery, altered routine, presence of mother for over 1 month," but he was "coping well with temporary change in functional status and routine," was "us[ing] therapy well," and reported "feel[ing] really good." (AR 704.) Dr. David noted that Plaintiff was interested in discontinuing citalopram because of "sexual side effects," but she recommended that he continue using it. (Id.) She noted that citalopram "has been working well" and that he had exhibited "[d]ecreased anxiety since starting [it]" from when she first saw him "several years ago." (Id.)

3. <u>Analysis</u>

The ALJ found that Plaintiff could perform medium work but was limited to "no greater than simple routine tasks" and "no more than occasional contact with the public and coworkers." (AR 24.) In so finding, the ALJ considered and gave "some weight" to the opinion of Dr. Miller. (Id.) He gave "no weight" to Dr. Miller's "more restrictive limitations," such as his opinion that

Plaintiff would be "off task 30% or more." (Id.) Because Dr. Miller's opinion was contradicted by other medical opinions in the record, the ALJ had to give only specific and legitimate reasons for discounting all or part of it. See Carmickle, 533 F.3d at 1164. As discussed below, the ALJ did so.

As an initial matter, it is not clear that Dr. Miller was among Plaintiff's treating physicians. The record shows that Dr. Miller apparently first saw Plaintiff on December 19, 2014 (AR 667), interviewed him and administered a series of tests on January 7, 2015 (AR 656), and completed two reports (AR 665, 669). The record does not contain any notes or treatment records from December 19, 2014. Indeed, Dr. Miller's reports appear to be based only on Plaintiff's January 7, 2015 visit. (See AR 656-69.) Even if the Court assumes Dr. Miller was a treating doctor, however, the length of the treatment relationship is relevant in assessing whether the ALJ gave specific and legitimate reasons for rejecting his opinion to the extent he did so, as the ALJ correctly found (AR 24). See §§ 404.1527(c), 416.927(c).

To the extent the ALJ rejected portions of Dr. Miller's opinion, he gave legally sufficient reasons for doing so. First, the ALJ gave "no weight" to Dr. Miller's "more restrictive limitations," such as his opinion that Plaintiff would be "off task 30% or more," because they were inconsistent with the medical record and "not well supported" by diagnostic evidence. (AR 24.) Indeed, the opinion that Plaintiff would "be off task 30% or more" is inconsistent with the other findings in Dr. Miller's reports, including that he would not be significantly limited in performing sustained work on a mental basis. (AR 24,

16

664, 667-68.)  After administering a series of psychological
tests, Dr. Miller found that Plaintiff's attention was within
normal limits (AR 664) and had no limitations in his ability to
maintain attention and concentration for extended periods of
time; perform activities within a schedule, maintain regular
attendance, and be punctual within customary tolerances; and
sustain an ordinary routine without special supervision (AR 667-
68).  He had no restrictions of daily living or difficulty
maintaining concentration, persistence, and pace.  (AR 668.)
These findings are inconsistent with an opinion that Plaintiff
would be off task for more than 30 percent of the time in a work
setting.

The other medical evidence in the record does not support an
opinion that Plaintiff would often be off task in a workplace
setting.  Although Plaintiff reported symptoms of anxiety and
depression, other than Dr. Miller, no doctor or clinician opined
that he would be significantly impaired in his ability to be on
task at work.  Indeed, Dr. Martin found that Plaintiff showed
"good" concentration and attention span (AR 428) and was
"unimpaired" in his ability to maintain adequate pace or
persistence to perform simple and complex tasks, maintain
adequate attention and concentration, adapt to changes in job
routine, and interact appropriately with coworkers, supervisors,
and the public on a regular basis (AR 430).  State-agency doctors
Funkenstein and Kaspar also determined that Plaintiff had only
mild difficulty maintaining concentration, persistence, or pace.
(AR 55, 67.)  Therapist White found that Plaintiff had intact
concentration and appropriate attention and judgment.  (AR 2394.)

And Dr. David, who treated Plaintiff from at least 2013 to 2015, did not mention any limitation in his ability to remain on task.

Inconsistency with the medical record and lack of diagnostic evidence are permissible reasons for the ALJ to have given portions of Dr. Miller's opinion little or no weight. See Batson, 359 F.3d at 1195 (ALJ may discredit treating physicians' opinions that are "unsupported by the record as a whole"); Thomas, 278 F.3d at 957 (ALJ need not accept treating-physician opinion that is "inadequately supported by clinical findings"); cf. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

The ALJ found the opinion of Dr. Martin "fully credible" in "showing [Plaintiff] is not significantly limited in performing sustained work on a mental basis," in part because it was "buttressed by a GAF score of 70." (AR 24.) Because Dr. Martin examined Plaintiff, her opinion alone can be substantial evidence for the ALJ to rely on. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

Finally, the ALJ noted that "[o]ther treating sources noted improvement with treatment." (AR 24.) Indeed, Dr. David, who treated Plaintiff over several years, consistently noted improvement with the use of medication and therapy. (See, e.g., AR 748 (Feb. 2015: "[m]ood and anxiety appear stable and controlled"), 704 (June 2015: Plaintiff "us[ing] therapy well" and showing "[d]ecreased anxiety since starting citalopram").)

18

Improvement with treatment and medication can be substantial evidence supporting an ALJ's nondisability determination.  See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for . . . benefits."); Thomas, 278 F.3d at 957; Allen v. Comm'r of Soc. Sec., 498 F. App'x 696, 697 (9th Cir. 2012). Moreover, Dr. Miller's opinion that Plaintiff would not benefit from mental-health treatment (AR 665) was inconsistent with Plaintiff's substantial beneficial treatment history and thus was properly discounted.

Plaintiff argues that Dr. Miller's opinion is consistent with the record (J. Stip. at 4), but this claim is not supported by the medical evidence.  For example, the "record" Plaintiff cites is Dr. Miller's own report (see id. (citing AR 664)), which, as discussed above, is not consistent with a finding that Plaintiff's limitations would cause him to often be off task.  He also cites to the report of therapist White (see id. at 5 (citing AR 2384)), but none of White's findings support an opinion that Plaintiff would be off task 30 percent of the workday.

Plaintiff also argues that the ALJ improperly dismissed Dr. Miller's opinion "because he only began treating [Plaintiff] in 2014"[11] and that "this could not constitute a specific and legitimate reason to dismiss Dr. Miller's opinion." (Id. at 6.) But the length of the treatment relationship is relevant to how

_____

[11] Again, the ALJ may have been generous in so finding, as it appears that Dr. Miller evaluated Plaintiff only once, on January 7, 2015. (AR 656.)

much weight a doctor's opinion should be accorded.  <u>See</u>
§§ 404.1527(c), 416.927(c).  Moreover, Plaintiff alleged an onset
date of December 30, 2012, but Dr. Miller's ability to assess
Plaintiff's mental state in the two years prior to when he first
saw him was likely limited.  <u>See</u> <u>Magallanes v. Bowen</u>, 881 F.2d
747, 754 (9th Cir. 1989) (ALJ properly rejected opinion of doctor
who had "no direct personal knowledge" of claimant's condition
until two years after alleged onset date); <u>cf.</u> <u>Vincent ex rel.</u>
<u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per
curiam) (ALJ properly ignored opinion of psychiatrist who
examined Plaintiff because "[a]fter-the-fact psychiatric
diagnoses are notoriously unreliable").  The ALJ properly
considered Plaintiff's apparently limited relationship with Dr.
Miller and gave his opinion "only partial weight" because of it.

Because the ALJ gave specific and legitimate reasons for
giving Dr. Miller's opinion partial weight, remand is not
warranted on this basis.

B.   <u>The ALJ Properly Assessed Plaintiff's Credibility</u>

Plaintiff argues that the ALJ failed to articulate legally
sufficient reasons for rejecting his testimony.  (J. Stip. at 21-
24.)  For the reasons discussed below, the ALJ did not err.

1.   <u>Applicable law</u>

An ALJ's assessment of symptom severity and claimant
credibility is entitled to "great weight."  <u>See</u> <u>Weetman v.</u>
<u>Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779
F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to
believe every allegation of disabling pain, or else disability
benefits would be available for the asking, a result plainly

contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674
F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d
597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the
ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d
at 1035-36. "First, the ALJ must determine whether the claimant
has presented objective medical evidence of an underlying
impairment [that] could reasonably be expected to produce the
pain or other symptoms alleged." Id. at 1036. If such objective
medical evidence exists, the ALJ may not reject a claimant's
testimony "simply because there is no showing that the impairment
can reasonably produce the degree of symptom alleged." Smolen,
80 F.3d at 1282 (emphasis in original).

If the claimant meets the first test, the ALJ may discredit
the claimant's subjective symptom testimony only if he makes
specific findings that support the conclusion. See Berry v.
Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or
affirmative evidence of malingering, the ALJ must provide "clear
and convincing" reasons for rejecting the claimant's testimony.
Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as
amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090,
1102 (9th Cir. 2014). The ALJ may consider, among other factors,
(1) ordinary techniques of credibility evaluation, such as the
claimant's reputation for lying, prior inconsistent statements,
and other testimony by the claimant that appears less than
candid; (2) unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment; (3) the
claimant's daily activities; (4) the claimant's work record; and

(5) testimony from physicians and third parties.  <u>Rounds v.</u>
<u>Comm'r Soc. Sec. Admin.</u>, 807 F.3d 996, 1006 (9th Cir. 2015) (as
amended); <u>Thomas</u>, 278 F.3d at 958-59.  If the ALJ's credibility
finding is supported by substantial evidence in the record, the
reviewing court "may not engage in second-guessing."  <u>Thomas</u>, 278
F.3d at 959.

## 2.   Relevant background

In a May 23, 2013 "Disability Summary" prepared by
Plaintiff, apparently to assist his treating doctors and the
agency, he reported a variety of physical ailments stemming from
his 1980 motorcycle accident.  (<u>See</u> AR 260-63, 691-93.)  He
reported treatment for anxiety and depression in 1984 and again
in 2013, and he noted that his physical symptoms had "left [him]
with lots of emotional anxiety."  (AR 692-93.)  He reported that
his anxiety "leads to compulsive, erratic decision making" and
that he "[c]an't sustain employment."  (AR 693.)

On February 18, 2013, Plaintiff reported to a doctor that he
"desire[d] to be placed on disability" and that he had stopped
taking his medications.  (AR 408.)  In a Function Report
completed on March 16, 2013, Plaintiff noted that he typically
spent his day "look[ing] for employment, apply[ing] for jobs,
[using] social network[s,] and attend[ing] school for further
training."  (AR 240.)  He had no problems with personal care
(<u>id.</u>); prepared his own food (AR 241); did his own cleaning,
laundry, and dishes (<u>id.</u>); shopped "once or twice per week" (AR
242); and socialized "with others" – dined, watched movies, went
for coffee – most days (AR 243).  He could pay attention for two
to three hours and could finish activities once he started them.

(AR 244.)  He noted that he could follow written and spoken
instructions "well" but that he often got agitated or annoyed.
(Id.)  In response to the question, "How well do you get along
with authority figures," he responded that he "get[s] along well
with most everyone."  (AR 245.)  He noted that he had lost
"several jobs due to being unable to inhibit" his emotions (id.)
and because of his "impulsive decision making or behavior" (AR
259).[12]

On November 6, 2014, Plaintiff told Dr. David that he "just
want[ed] to kick back and be happy" and was "hoping to get SSI"
because he "does not feel able to look for or maintain a new
job," but he was "heading out after [the] appointment to help a
friend paint her kitchen" and had recently slept "12 straight
hours after doing physical labor with [a] friend."  (AR 493.)

At the September 21, 2015 hearing, Plaintiff testified that
he "see[s] a psychologist on a steady basis," which he found
helpful.  (AR 39.)  He was able to cook, shop, and clean up after
himself.  (AR 40.)  He stated that when he was "under stress or
pressure" he sometimes "speak[s] harshly" or will "fly off the
handle."  (AR 41.)  He acknowledged that his anxiety had "gotten
better" since taking medication (AR 42), but he sometimes
suffered from "uncontrollable crying spells" (AR 43).

---

[12] This contradicts the November 3, 2014 report of therapist
White, who noted — apparently based on what Plaintiff told her —
that Plaintiff had been fired from eight jobs since 2002 but "was
not fired for his behavior at work" but because "the economy was
changing."  (AR 2403.)

1                    3.  Analysis

2          The ALJ found Plaintiff "not credible to the extent of

3     establishing disability," finding that although his "medically

4     determinable impairments could reasonably be expected to cause

5     the alleged symptoms," his "statements concerning the intensity,

6     persistence and limiting effects of [those] symptoms" were not

7     credible to the extent they were inconsistent with his RFC.  (AR

8     25.)  He found that Plaintiff had the residual functional

9     capacity to perform medium work, could lift and carry 25 pounds

10    frequently and 50 pounds occasionally, and could sit and stand

11    about six hours during an eight-hour workday.  (AR 24.)  He could

12    perform "no greater than simple routine tasks," however,

13    "involving no more than occasional contact with the public and

14    coworkers."  (Id.)

15         Plaintiff argues that the ALJ improperly rejected his

16    allegation that he "would be unable to work because of his

17    distractibility, confusion, emotional liability, difficulty with

18    changes in routine, unexpected events, and contradictory

19    instructions."  (J. Stip. at 23.)  Indeed, Plaintiff objects to

20    the ALJ's credibility assessment only as to his alleged mental

21    impairment; he does not contest any credibility assessment

22    related to his alleged physical symptoms.  (See id. at 21-24, 32-

23    34.)  The ALJ afforded some weight to Plaintiff's subjective

24    complaints of decreased mental functioning: he limited Plaintiff

25    to "no greater than simple routine tasks," "involving no more

26    than occasional contact with the public and coworkers."  (AR 24.)

27    As discussed below, to the extent the ALJ rejected Plaintiff's

28    subjective complaints of mental-health impairment, he provided

                                    24

clear and convincing reasons for doing so.

First, the ALJ found that Plaintiff's activities of daily living were inconsistent with his statements about his severe impairments and "indicate the capacity to perform focused and sustained activities similar to the capacity required to perform work duties at many jobs." (AR 25.) At the hearing, Plaintiff testified that he was able to keep his house clean, cook, and shop. (AR 40.) He typically spent his day looking and applying for jobs, using social networks, and attending school for further training. (AR 240.) He worked as an extra in movies in November 2014 (AR 2403) and February 2015 (AR 748), when he was also looking into volunteering opportunities (id.). He socialized most days. (AR 243.)

Keeping a house clean, shopping once or twice a week, socializing most days, seeking and applying for jobs daily, and attending training classes are inconsistent with Plaintiff's allegation that he would be unable to sustain the level of concentration needed to maintain employment and that his anxiety was so great he would not be able to hold a job. Indeed, Plaintiff spent "most days" socializing with other people at a local coffee shop (AR 243, 510), lived with roommates (AR 748), and reported that he "get[s] along well with most everyone" (AR 245), belying his claims of anxiety so great he could not work with others. An ALJ may properly discount a plaintiff's credibility when his daily activities are inconsistent with his subjective symptom testimony. See Molina, 674 F.3d at 1112 (ALJ may discredit claimant's testimony when "claimant engages in daily activities inconsistent with the alleged symptoms" (citing

Lingenfelter, 504 F.3d at 1040)). "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina, 674 F.3d at 1113; see also Blodgett v. Comm'r of Soc. Sec. Admin., 534 F. App'x 608, 610 (9th Cir. 2013) (substantial evidence supported ALJ's adverse credibility finding because claimant "was social and had no difficulty getting along with other people" despite allegations of anxiety); Gerard v. Astrue, 406 F. App'x 229, 231 (9th Cir. 2010) (ALJ properly disregarded medical opinion of severe anxiety and relational problems when claimant testified that "she left her house to shop for clothes and groceries, to attend GED classes, and to visit with her mother").

In January 2013, Plaintiff was completing training classes. (AR 402.) He was attending school for further training in March 2013. (AR 240.) In February 2015, he was advised to increase the "structure" of his day and was "look[ing] into volunteering activities." (AR 748.) His ability to attend and complete training classes is inconsistent with Plaintiff's allegation that he would be unable to remain on task in a workplace setting. See Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (finding that ALJ properly considered claimant's completion of training course when rejecting his subjective pain testimony).

Second, the ALJ found that Plaintiff's "[n]oncompliance with medical advice tends to diminish [his] credibility." (AR 25.) Indeed, Plaintiff stopped taking his prescribed medication on at least two occasions; each time the doctor recommended that he

continue to take medication for his anxiety because it was effective.  (See AR 410 (Jan. 1, 2013: Plaintiff reported that he had "taken Xanax before but didn't like taking [it] daily – stopped when feeling better," doctor then prescribed citalopram),[13] 408 (Feb. 8, 2013: Plaintiff alleged he could not tolerate citalopram prescribed in Jan. 1 visit, had stopped taking it after "couple of days"; doctor "recommended trying to continue with medication"), 2401 (Dec. 2, 2014: Plaintiff currently taking citalopram, which was "helpful"), 704 (June 18, 2015: Plaintiff "interested in changing" from citalopram to different psychotropic medication because of "sexual side effects," Dr. David recommended waiting because "Citalopram has been working well").)

Plaintiff argues that he stopped taking citalopram because he was "unable to tolerate" it (J. Stip. at 24 (citing AR 408)), but the medical record shows that he complained only of the "sexual side effects" of citalopram (AR 246, 406, 704), and in June 2015 Dr. David recommended that he continue to take it because she had noticed "[d]ecreased anxiety" since he started it (id.).  Plaintiff apparently took citalopram for years despite allegedly being unable to tolerate it.  (See, e.g., AR 405 (Mar. 2013, Plaintiff reported that he "likes having citalopram"), 578 (Mar. 2013, Dr. David noting that Plaintiff had been taking

---

[13] Xanax is the brand name of a drug used to treat anxiety and panic disorders.  Alprazolam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a684001.html (last updated Mar. 15, 2017).

citalopram for "1.5 months" and was "more calm"), 2401 (Dec. 2014, Plaintiff taking citalopram, which was "helpful"), 736-39 (May 2015, Plaintiff taking citalopram daily, noting that he "sleep[s] well" with "anxiety well under control").)[14] An ALJ may rely upon a claimant's noncompliance with treatment as a clear and convincing reason for an adverse credibility finding. See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may discount claimant's testimony in light of "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment"); Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007).

Finally, the ALJ noted that Plaintiff received "limited and conservative treatment," which was "inconsistent with" his alleged severity of symptoms. (AR 25.) Plaintiff does not dispute this finding as to his physical ailments. Similarly, the medical record indicates that Plaintiff's anxiety was effectively managed by therapy sessions and medication and that no more intensive or invasive treatment was needed. (See AR 2401 (Nov. 2, 2014: noting currently taking three "helpful" medications), 799 (Jan. 22, 2015: "[s]till taking Citalopram," "[a]nxiety appears under control"), 1428 (May 23, 2015: Plaintiff reported no psychiatric hospitalizations and was "coping with his

_____

[14] Plaintiff also complained of "increased fatigue and drowsiness" when his citalopram dosage was increased, but that was apparently resolved by "taking medicine before bed." (AR 512; see also AR 246 (Mar. 2013 Function Report alleging side effects of citalopram as "insomnia & impotence"), 516 (Sept. 2014 visit to doctor apparently because of side effect of "increased citalopram dosing," resolved with Plaintiff "now taking before bed without issue"), 799 (Jan. 2015, Plaintiff reported "[s]leeping well" and "[s]till taking [c]italopram").)

condition"), 704 (June 18, 2015: Dr. David noting that Plaintiff "[c]ontinues to use therapy well" and exhibited "[d]ecreased anxiety since starting citalopram evident to this clinician since first seeing [Plaintiff] several years ago").)  Conservative treatment can legitimately discredit a claimant's testimony.  See Parra, 481 F.3d at 751.

Plaintiff argues that his condition was "not amenable to treatment," pointing to Dr. Miller's January 26, 2015 opinion that "mental health services" were not recommended because "treatment would be fairly challenging." (J. Stip. at 24, 34 (citing AR 664-65).)  But in June 2015, after Dr. Miller's examination of Plaintiff, Dr. David noted that Plaintiff "use[d] therapy well" and had exhibited "[d]ecreased anxiety since starting citalopram evident to this clinician since first seeing [Plaintiff] several years ago." (AR 704.)  Indeed, Plaintiff himself noted on many occasions that his mental-health treatment was helpful.  (See, e.g., AR 39 (Sept. 2015 hearing testimony that "see[ing] a psychologist on a steady basis" was helpful), 804 (Dec. 2014, Plaintiff reporting to Dr. David that he was "happier now" than he "ever was before"), 2401 (Nov. 2014, noting currently taking three "helpful" medications).)

In sum, the ALJ provided clear and convincing reasons for finding Plaintiff's symptom allegations not credible.  Because those findings were supported by substantial evidence, this Court may not engage in second-guessing.  See Thomas, 278 F.3d at 959. Plaintiff is not entitled to remand on this ground.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42

29

U.S.C. § 405(g),[15] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: April 25, 2017        _____
                                     JEAN ROSENBLUTH
                                     U.S. Magistrate Judge

---

[15] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."